**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DANNY R. CHILDRESS, SR., Administrator of the Estate of STEPHEN A. CHILDRESS, Deceased,<br>3 Elmwood Road<br>Mount Laurel, NJ  08054<br><br>            v.<br><br>GARGI SCHNEIDER, M.D.<br>100 N. Academy Drive<br>Danville, PA  17822<br>            and<br>GEISINGER MEDICAL CENTER<br>100 N. Academy Drive<br>Danville, PA  17822<br>            and<br>GEISINGER CLINIC<br>d/b/a GEISINGER MEDICAL GROUP<br>100 North Academy Avenue<br>Danville, PA 17822<br>            and<br>GEISINGER HEALTH SYSTEM<br>FOUNDATION d/b/a GEISINGER HEALTH SYSTEM<br>100 North Academy Avenue<br>Danville, PA 17822<br>            and<br>UPMC   HOME   HEALTHCARE   OF CENTRAL PENNSYLVANIA, a/k/a UPMC HOME HEALTHCARE OF CENTRAL PA – SUSQUEHANNA<br>1100 Grampian Blvd<br>Williamsport, PA 17701<br>            and<br>JOHN and JANE DOES 1-10<br>            and<br>ABC CORPORATION 1-10 | CIVIL ACTION<br><br><br>CASE NO.: |

COMPLAINT - 1

## CIVIL COMPLAINT - MEDICAL PROFESSIONAL LIABILITY

AND NOW, comes the plaintiff, DANNY R. CHILDRESS, SR., Administrator of the Estate of STEPHEN A. CHILDRESS, Deceased, averring as follows in support of this Complaint:

### PARTIES

1. Plaintiff, Danny R. Childress, Sr., is an adult individual residing at 3 Elmwood Road, Mount Laurel, NJ 08054, and is the Administrator of the Estate of Stephen A Childress, Deceased, and acting as a personal representative for Stephen A Childress's minor children who are beneficiaries of the wrongful death and survival claims set forth at length in the paragraphs below.

2. Stephen Childress is survived by four (4) minor children and two (2) parents at the time of his death:

    a.  Stephen A. Childress (Father)

    b.  Elena B. Childress (Mother)

    c.  A.C., a minor (Daughter)

    d.  A.C., a minor (Son)

    e.  A.C., a minor (Son)

    f.  A.C., a minor (Son)

3. Defendant, Gargi Schneider M.D., ("Dr. Schneider") is an adult individual and physician licensed to practice medicine in the Commonwealth of Pennsylvania who specializes in internal medicine, who maintains an office at c/o Geisinger Clinic, 100 North Academy Road, Danville, Pennsylvania 17822. At all times relevant hereto, Dr. Schneider was the employee and/or agent and/or ostensible agent and/or apparent agent of Defendants

Geisinger Medical Center, Geisinger Clinic d/b/a Geisinger Medical Group, and/or Geisinger Health System Foundation d/b/a Geisinger Health System and was a health care provider within the meaning of the Medical Care Availability and Reduction of Error (MCARE) Act, 40 Pa.S.C. § 1303.712.101, et. seq.

4. Defendant, Geisinger Medical Center, is a corporation, or other business entity, organized and/or existing under the laws of the Commonwealth of Pennsylvania, and is engaged in the business of providing healthcare and services to the general public, and maintained a principle place of business at 100 North Academy Road, Danville, PA 17822, and at all times material and relevant hereto acted through its agents, servants, workmen, and/or employees, as well as the other physicians, nurses, and staff detailed herein, whose negligence is imputed to it. Plaintiffs are asserting a professional liability claim against Defendant Geisinger Medical Center.

5. Defendant, Geisinger Clinic d/b/a Geisinger Medical Group, is a corporation, or other business entity, organized and/or existing under the laws of the Commonwealth of Pennsylvania, and is engaged in the business of providing healthcare and services to the general public, and maintained a principle place of business at 100 North Academy Road, Danville, PA 17822, and at all times material and relevant hereto acted through its agents, servants, workmen, and/or employees, as well as the other physicians, nurses, and staff detailed herein,

whose negligence is imputed to it. Plaintiffs are asserting a professional liability claim against Defendant Geisinger Medical Center.

6. Defendant, Geisinger Health System Foundation d/b/a Geisinger Health System, is a corporation or other business entity, organized and/or existing under the laws of the Commonwealth of Pennsylvania, and is engaged in the business of providing healthcare and services to the general public, and maintained a principle place of business at 100 North Academy Road, Danville, PA 17822, and at all times material and relevant hereto acted through its agents, servants, workmen, and/or employees as well as the other physicians, nurses, and staff detailed herein, whose negligence is imputed to it. Plaintiffs are asserting a professional liability claim against Defendant Geisinger Medical Center.

7. The authorized agents, ostensible agents, servants, workmen, and employees, as described herein, of Defendants, Geisinger Medical Center, Geisinger Clinic d/b/a Geisinger Medical Group, and Geisinger Health System Foundation d/b/a Geisinger Health System, include but are not limited to, Dr. Patrick McKillion, Dr. Gargi Schneider, Dr. Darrell McBride II, Dr. Mayur Jayant Amin, Dr. Umair Iqbal, Dr. Shannon Ashley Sullivan, Dr. Gerard J Cush, Dr. Ryan Martin, Dr. Daniel Scott Horwitz, Dr. Alfred Michael Luciani, Dr. Keith Gibson, Dr. Jason Dinko, Dr. John M, Brittney Ryann Smith, PA-C, Ma Lourdes T Bahoy, Rachel E Toter RN, Barbara J Mitcheltree RN.

8. Defendant, UPMC Home Healthcare of Central Pennsylvania, a/k/a UPMC Home Healthcare of Central PA  -- Susquehanna (Hereinafter "UPMC Home Healthcare")  is a corporation or other business entity, organized and/or existing under the laws of the Commonwealth of Pennsylvania, and is engaged in the business of providing healthcare and services to the general public, and maintained a principle place of business at 1100 Grampian Blvd., Williamsport, PA 17701, and at all times material and relevant hereto acted through its agents, servants, workmen, and/or employees and staff detailed herein, whose negligence is imputed to it. Plaintiffs are asserting a professional liability claim against UPMC Home Healthcare.

9. The authorized agents, ostensible agents, servants, workmen, and employees, as described herein, of Defendant, UPMC Home Healthcare, include but are not limited to, Angela Stahl RN and Barbara Kluck RN.

10. Defendants John and Jane Does 1-10 are adult individuals and professionals who provided negligent medical care and treatment to Plaintiff Stephen Childress during his hospitalization at Geisinger and/or while a patient of UPMC Home Healthcare, set forth in greater detail below, and whose names, positions, and titles are known only to Defendants herein. Plaintiffs are asserting a professional liability claim against Defendants Jane Does 1-10.

11. Defendants ABC Corporations 1-10 are corporations, partnership, limited liability companies and/or other similar entities who, either directly and/or through their agents and/or employees, provided negligent medical care to

Plaintiff Stephen Childress during his hospitalization at Geisinger and/or while a patient of UPMC Home Healthcare, set forth in greater detail below, and whose identities, names, positions, and/or titles are known only to Defendants herein. Plaintiffs are asserting a professional liability claim against Defendants ABC Corporations 1-10.

12. All Defendants described herein are jointly and severally responsible for the medical and surgical care and treatment of Plaintiff and for all injuries and damages sustained by Plaintiffs, as described herein.

13. A jury trial is hereby demanded.

## JURISDICTION AND VENUE

14. Jurisdiction in the Middle District of Pennsylvania is proper pursuant to 28 U.S.C. § 1332 as the Plaintiff is a citizen of the State of New Jersey and the Defendants are all residents of the Commonwealth of Pennsylvania and the amount in controversy exceeds the jurisdictional threshold; accordingly, diversity of citizenship exists.

15. Venue in the Middle District of Pennsylvania is proper as all acts and/or omissions complained of occurred within the Middle District.

## FACTS

16. On December 25, 2019, Stephen Childress, who was 31 years old, sought medical treatment at Geisinger Medical Center Emergency Department for evaluation of an a small sore on his toe that had become infected.

17. Prior to seeking care at Geisinger, Childress had developed chills and nausea with worsening toe pain and the sensation that the infection was spreading up his leg.

18. Upon admission, Childress was reported to have a 1 cm ulceration and surrounding blistered tissue on inferomedial aspect of first phalanx of the left foot with surrounding erythema. The tissue was noted to be tense, warm, and tender to touch without apparent fluctuance.

19. Childress informed Geisinger medical staff the wound was present for several months but in the past week it became discolored with a foul-smelling odor and very painful.

20. He also noted that there was redness extending from the area of the ulcer about 1 – ½ inches.

21. Childress informed Geisinger medical staff that he was a type II diabetic but did not take insulin to control his diabetes because he did not have health insurance.

22. An x-ray taken December 25, 2019, of Childress' left foot indicated a "soft tissue wound" without any findings to suggest osteomyelitis.

23. In Geisinger Emergency Department, Childress was found to be tachycardic into the 140s, febrile to 38.8 with hypertension at 158/105. His lactate was elevated to 3.3 and glucose was elevated to 378.

24. Childress was provided 2 liters normal saline bolus. He was administered Clindamycin, Vancomycin and Cefepime and was admitted to the hospital.

25. On December 26, 20219, Dr. James Piper and Dr. Gerard Cush evaluated Childress and performed incision and drainage where pus was expressed and the wound was packed with gauze and then covered with 4x4s and wrapped with Kerlix.

26. On December 26, 2019, Dr. McKillion and Dr. Schneider evaluated Childress and made a diagnosis of severe sepsis due to left great toe diabetic foot ulcer status post debridement.

27. Childress was provided Vancomycin and Cefepime pending wound and blood cultures.

28. On December 26, 2019, Mr. Childress was consulted by Wound Care Specialist, Dr. Mayur Amin, for evaluation of his diabetic foot ulcer.

29. The wound was on Mr. Childress' first toe and measured at **2 cm X 1.2 cm X 0.6cm**.

30. His assessment was a Wagner grade 3 diabetic foot ulcer of the lower 1st toe and cellulitis from lower left extremity toe ulcer. The wound contained undermining / tunneling 2cm; mild purulent drainage; a moderate amount of pale pink tissue; small amounts of yellow/fibrinous slough, exposed tendon with an erythermatous, tender and fluctuant peri-wound.

31. Dr. Amin further debrided the wound at bedside with pus expressed.

32. Dr. Darrell McBride II D.O. reviewed the wound culture collected on 12/26/2019 finding gram positive cocci. He recommended to continue with Cefepime and Vancomycin and MRI pending given concern for osteomyeltis.

33. Dr. Ksenia Orlova vascular ankle brachial indices with photoplethysmography performed at 1109-1131 hours with the impression of normal ankle brachial index at rest is 1.26 on the right and 1.25 on the left.

34. On December 26, 2019, at $1400 - 1515$ hours, an MRI of left foot with and without contrast performed confirmed that there was no evidence of osteomyelitis or abscess.

35. On December 26, 2019, at 1600 a wound assessment performed by Kassondra Turesell LPN indicated wound appearance red, maceration, black, with odor and erythermatous peri-wound.

36. On December 27, 2019, at 0606 hours Childress reported to improving toe pain at 4/10, and fevers and chills overnight.

37. Dr. McKillion DO and Dr. Schneider ordered to continue Vancomycin and Cefepime, follow cultures, and to start Novolin N 15 units a day (hoping he could keep this regimen on discharge with Walmart Insulin).

38. On December 27, 2019, at 0621 hours Childress had a CRP of 129 and Sedimentation rate of 45.

39. On December 27, 2019, at 800 hours Seven Brady RN noted Childress diabetic ulcer had a red; yellow wound appearance and mild serosanguinous drainage with erythematous peri-wound.

40. On December 27, 2020, at 1001 hours Dr. Darrell McBride II ordered to continue with Cefepime and Vancomycin and due to no health insurance on discharged recommend 3 weeks of Cipro 500 mg per oral twice a day and Augmentin 875 mg per oral twice a day, cultures showed no growth of significant bacteria at this point and no evidence of MRSA. He ordered follow up with Medicine Ortho in 1 week to check wound and schedule ID clinic appointment in 4-5 weeks of sign off.

41. On December 28, 2020, at 0656 hours Dr. McKillion DO noted Childress toe pain was improving, he required additional dose of Oxycodone overnight, EKG unremarkable for ischemic changes and resolved chest pain. Childress was to continue Vancomycin and Cefepime.

42. On December 29, 2019, Dr. Daniel Torino evaluated Childress' left great toe after bedside debridement noting resolving cellulitis, superficial sloughing, silt DP/SP/T and ROM pain.

43. Dr. Tornio ordered Vancomycin to be replaced with Clindamycin 900 mg every 8 hours via IV because the rapid course of Childress' infection was consistent with a beta-

hemolytic Streptococcus causing the production of toxins, which was believed to be the cause of Childress' residual low grade temperature and continued pain.

44. On December 29, 20219, at 1502 hours, Dr. Schneider noted the patient was still having pain of his great toe and fevers >38 nightly.

45. On December 30, 2019, at 1624 hours, Dr. McKillion noted Childress continued to report pain in his toe and presents with low grade fever.

46. On December 30, 2019, at 1706 hours, Dr. Darrell McBride recommended stopping Cefepime and switching IV Clindamycin to PO Clindamycin 600 mg PO thrice a day upon discharge.

47. On December 31, 2019, at 0842, Dr. Patrick McKillion noted Childress still reports pain in his toe but improving and still presents with low grade fever early in the evening.

48. On December 31, 2019, at 1204 hours, Stacy Taylor R.N. noted Dr. Patrick McKillion and other Green team doctors made aware of redness/purple area to outer aspect of left foot noted during dressing change, patient reports that it seems more on foot than it was yesterday.

49. On December 31, 2019, at 1209, hours Dr. Patrick McKillion made aware Childress had a 100.2F temperature.

50. Childress low grade fever, toe pain and purple area to outer aspect of his left foot on 12/31/2019 indicative of severe deep infection. However, Mr. Childress was not further evaluated and appropriately treated for severe deep infection.

51. Discharge planning should be initiated when the signs and symptoms of infection are clearly responding to treatment (resolution of the local and systemic signs of infection).

52. Mr. Childress had no resolution of local and systemic signs of infection.

53. Despite ongoing fevers, progressive erythema and continued moderate to severe pain, Mr. Childress was transitioned to oral antibiotics and Dr. Gargi Schneider inappropriately discharged him to home to be seen by Home Health Services.

54. He was prescribed Clindamycin 600mg thrice a day for 3 weeks and Novalin N 25 units in the morning and Novolin N 20 units in the evening, Acetaminophen 325 mg, Insulin, Lispro, Oxycodone.

55. Childress' left foot wound was recorded at 2.5 cm at the time of discharge with surrounding erythema and warmth.

56. On January 1, 2020, orders were placed by Dr. Jason Dinko for UPMC Home Healthcare to provide skilled nursing services from 1/1/20 – 2/29/20 including wound care and instruction on wound care of ½ strength Dakin's solution, pad with gauze and ABD, secure with Kerlix, Clindamycin HCL 300mg, wrap 4 inches Ace wrap from toe to ankle, 6 inches Ace wrap from ankle to knee, PT and OT once a week for 1 week.

57. On January 1, 2020, Barbara Kluck RN of UPMC Home Healthcare noted left dorsal foot red and warm that radiates to ankle – patient reports unchanged macerated tissue to top and between 1st and 2nd toes with open wound between toes. The wound dimensions were 3 x 00.30 x .30 cm, greater than 25% slough, moderate red sanguineous drainage, the peri-wound had edema, erythema, warmth and was macerated. Childress reported pain of 8 intensity.

58. On January 3, 2020, Angela Stahl RN of UPMC Home Healthcare assessed Childress and noted left great toe wound to have 100% granulation, heavy red serosanguinous drainage, and odor. Childress' pain was 8/10 and he had a temperature of 99.2 F. Peri wound was noted to be intact and macerated with warmth an erythema. UPMC Home Healthcare notes

indicate an appointment was scheduled with Dr. Mayur at the wound clinic on 1/7/20 and Dr. Dinko on 1/9/20.

59. Angela Stahl RN noted "wound with odor" and called Geisinger requesting additional oxycodone for Childress because he was in a "considerable amount of pain."

60. Dr. Keith Gibson responded that Dr. Dinko had too many patients as it is, had never seen Childress and didn't know how Dinko's name was attached to Childress. Dr. Gibson prescribed a 3-day supply of Oxycodone and recommended he see orthopedics if "still in this much pain."

61. On January 6, 2020, Angela Stahl RN of UPMC Home Healthcare assessed Childress' wound dimensions at **6cm in length, 2cm in width, and 0.2cm in depth**. She reported to Dr. Mayur Amin at Geisinger Wound Clinic that his wound had odor with dressing change.

62. Dr. Amin acknowledged the message and waited to address the complaints at Childress scheduled appointment the following day.

63. On January 7, 2020, Childress attended an outpatient consultation with Dr. Mayur Amin at Geisinger Wound Clinic.

64. Childress presented with worsening pain, erythema, edema and purulent drainage and Dr. Mayur Amin determined he would need inpatient admission for antibiotics and consult for surgical debridement.

65. Dr. Amin assessed Childress had a grade 3 DFU of the LLE 1st toe, DM2 uncontrolled and cellulitis from LLE toe ulcer failed outpatient per oral antibiotics.

66. On January 7, 2021, Childress was readmitted to Geisinger Medical Center with anticipated need for surgical intervention.

COMPLAINT - 12

67. On January 7, 2021, Brittney Ryann Smith, PA-C determined Childress was at risk for venous thromboembolism; however, he was not administered chemical prophylaxis or sequential compression devices or Thrombo-Embolus Deterrent stockings throughout his January 7 – 13 admission to Geisinger.

68. On January 7, 2021, at 2101 hours Childress left foot ulceration was noted to be malodorous with purulent drainage.

69. Childress was started on empiric therapy with Zosyn and Vancomycin but had reaction to Zosyn so switched to Cefepime and Flagyl for broader coverage.

70. On January 7, 2020, at 2212 hours, Childress was assessed by Alfred Luciani, MD, who reported that Childress had low grade fevers, chills and sweats almost daily for the past week.

71. Upon physical examination Dr. Luciani reported multiple ulcers on the great toe. The plantar wound at 5 cm with health granulation tissue. The wound between his first and second toes appears to have purulent and foul-smelling drainage about 2 cm in diameter. The lateral aspect of the foot appears erythematous with a finely demarcated pattern.

72. On January 08, 2020, at 0002 hours, an X-ray of his left foot was performed, which suggested a mild cortical osseous loss on the lateral aspect of the 1st proximal phalanx on oblique view which was suspected to be due to developing osteomyelitis, overlying soft tissue gas, projection, or disuse osteopenia.

73. On January 8, 2020, at 1346 hours, internal medicine progress notes by Shannon Sullivan MD indicate Childress complained of severe leg pain.

74. On January 8, 2020, at 1556 – 1633 hours Dr. Horwitz performed excisional debridement of Childress' left forefoot diabetic infection including skin, subcutaneous tissue, muscle,

and bone, greater than 20 cm squared.  There was no plan for urgent or emergent return to ER.

75. Intraoperatively, he was found to have a foul-smelling drainage from an opening between the 1st and 2nd toes. This area was found to track proximally onto the lateral dorsum of his left foot. Incision was made through the 1st webspace into the dorsum of the foot Incision was made through the 1st webspace into the dorsum of the foot. An incision was made on the lateral aspect of the foot to the tracking area, and any area of necrotic skin was sharply excised. Gross purulence was encountered. Foot was debrided. 2 x culture sent to microbiology.

76. On January 8, at 1643, hours Dr. Matthew Geswell noted Childress to be chronically ill, lethargic.

77. On January 9, 2020, at 0533 hours Dr. John Holbert noted his temperature was 37.5C (99.5F).

78. On January 9, 2020 at 1130, Dr. Mayur Amin examined Childress finding occasional polymorphonuclear leukocytes and few gram-positive cocci. His assessment was a Wagner Grade 3 DFU of the left lower extremity 1st toe with osteomyelitis status post excisional debridement of left forefoot including skin, subcutaneous tissue, muscle, and bone 01/08/2020 with Dr. Horwitz- acutely worse today, large amount of peri-wound necrosis and exposed tendons, prognosis for wound healing is poor without further debridement and control of osteomyelitis

79. Dr. Amin noted that the first post-op dressing shows necrotic tissue present throughout with exposed soft bone and dusky/ischemic soft tissue/tendons. Will need further surgical

intervention. Will re-contact Orthopedics, Dr. Parenti for further treatment. Continue IV antibiotics per ID.

80. On January 9, 2020, at 1756 hours, Dr Darrell McBride reviewed microbiology data from 1/8/20 the tissue cultures x2 preliminary indicated rare polymorphonuclear leukocytes seen, many gram-positive cocci, many gram negative rods.

81. On January 9, 2020, Childress left foot X-Ray findings suggested that Childress may be developing osteomyelitis.

82. On January 10, Childress continued to complain of significant pain in his left leg.

83. On January 10, 2020, at 1014 hours, medical student Tessa Scheckelho noted concerns for possible necrotizing infection with rapid changes in x-ray findings of foot since recent hospitalization.

84. On January 10, 2020, at 1524 hours, Dr. Umair Iqbal noted Childress had a rough morning with significant pain in his lower extremity.

85. On January 10, 2020, at 1814 hours, Dr. Darrell McBride recommended adding Clindamycin for anti-toxin.

86. On January 11, 2020, at 0819 – 0849 hours, Dr. Ryan Martyn who was accompanied by Dr. Gerard Cush performed excisional debridement of Childress' left foot and a partial ray resection of the left great toe under anesthesia.

87. The postoperative plan was that Childress would need further definitive treatment to include possible transmetatarsal amputation or a below-the-knee amputation due to a dorsal foot infection.

88. On January 12, 2020, at 0757 hours, Childress was informed of risks and benefits of procedures and Childress gave consent for any necessary procedures, including a below-the-knee amputation ("BKA") to be performed.

89. On January 12, 2020, at 1131 hours, a culture report indicated "rare polymorphic leukocytes seen; many gram-positive cocci; many gram negative rods." and "multiple species of aerobic and/or anaerobic bacteria."

90. On January 12, 2020, at 1234 hours Dr. Umair Iqbal noted Childress temperature to be 36.22C (97.196 F)

91. On January 13, 2020, at 1347 hours, Dr. Cassandra Ricketts indicated in a preoperative note that consent was signed and the patient would be going for exploration, I and D, left foot with possible transmetatarsal amputation versus transmetatarsal disarticulation on January 14, 2020.

92. On January 13, 2020, at 1400 hours, medical student Tessa Scheckelho noted Childress had severe pain in his left foot and a temperature of 37.22C (98.996 F). Scheckelho recommended Ceftriaxone and to continue Metronidazole.

93. On January 13, Childress was scheduled with Dr. Parenti for D&I, vs transmetatarsal amputation, vs BKA of LLE.

94. On January 13, 2020, at 1610 hours, Childress began having violent seizures and a Code Blue was called.

95. Resuscitation attempts were unsuccessful, and Childress was pronounced dead on January 13, 2020 at 1644 hours.

96. Childress' autopsy reported most likely cause of death to be pulmonary thromboembolism and marked pulmonary edema with diffuse alveolar damage (DAD); mild diffuse

hypoxic/ischemic changes within the brain possibly due to respiratory failure; and a postmortem culture from the atrial blood grew Candida parapsilosis similar to the premortem culture of the right great toe wound.

97. Defendants' negligent acts and/or omissions, set forth in detail herein, increased the risk of harm and/or proximately caused Plaintiff to suffer injuries are harm including:

   a. Severe pain and suffering;

   b. Multiple surgical procedures;

   c. Sepsis;

   d. Necrotizing fasciitis;

   e. Osteomyelitis;

   f. Pulmonary thromboembolism and pulmonary edema with diffuse alveolar damage;

   g. Respiratory failure;

   h. Seizures;

   i. Additional surgical and/or medical procedures;

   j. Additional hospitalizations;

   k. Loss of life's pleasure;

   l. Disfigurement;

   m. Past and future wage loss / and or earnings capacity loss;

   n. Past and future medical expenses;

   o. Death; and

   p. The full measure of damages allowed under the law of the Commonwealth of Pennsylvania, including, but not limited to the categories of expenses, contribution, support and/or services.

COMPLAINT - 17

## COUNT I – PROFESSIONAL NEGLIGENCE
## <u>PLAINTIFF v. GARGI SCHNEIDER, M.D.</u>

98. The preceding paragraphs of this Complaint are incorporated herein as if fully set forth at length.

99. The negligence of Defendant, Gargi Schneider, M.D., constituted a breach of the applicable medical standard of care and caused/contributed to the worsening condition of the wound and the untimely death of Stephen Childress.

100.    The aforementioned incident was caused by the negligent and careless conduct of Defendants and consisted, inter alia, of the following:

a. Failure to appropriately evaluate and treat Stephen Childress for severe deep infection in the setting of persistent fever, toe pain, purple discoloration of the outer aspect of the left foot and elevated levels of C-reactive protein (CRP) and erythrocyte sedimentation rate (ESR) on December 31, 2019;

b. Failing to properly evaluate plaintiff's condition;

c. Failing to timely and/or properly recognize/diagnose Plaintiff's condition;

d. Failing to timely and/or properly provide further medical examination to determine the cause of Plaintiff's condition;

e. Failing to timely and/or properly provide further diagnostic evaluation, including necessary and proper testing, cultures and/or imaging, to diagnose infection;

f. Failure to appreciate and treat the medical condition of Stephen Childress;

g. Negligently discharging Stephen Childress with a severe deep infection;

h. Failing to request timely and/or proper medical referrals and/or medical consults;

i. Failing to timely and/or properly order and/or obtain laboratory testing;

j.   Failing to administer proper mediation and/or antibiotics;

k.   Failing to timely and/or properly ensure Plaintiff was taken to the operating room;

l.   Failing to timely and/or properly ensure Plaintiff was ready to be taken to the operating room;

m.   Failing to timely and/or properly appreciate the seriousness/severity of Plaintiff's condition;

n.   Failing to timely and/or properly respond to the seriousness/severity of Plaintiff's condition;

o.   Allowing Plaintiff's condition to continue to persist without proper intervention;

p.   Failing to ensure Plaintiff received timely and or proper examinations, monitoring, and/or wound checks / examinations;

q.   Failing to properly and/or timely obtain information from other physicians, residents, fellows, nurses and/or hospital staff;

r.   Failing to properly and/or timely transmit / communicate information to other physicians, residents, fellows, nurses, and/or hospital staff;

s.   Failing to properly and/or adequately supervise residents, fellows, nurses and other staff;

t.   Failing to timely and properly respond to examination findings;

u.   Failing to timely and properly respond to the testing results; and

v.   Failing to timely and/or properly provide medical, radiological and/or surgical diagnostic care and/or treatment.

101.     As a result of the negligence of Defendant, Gargi Schneider, M.D., Stephen Childress experienced prolonged and unnecessary pain and suffering, both psychologically and physically, up until and including his death.

102.     As a result of the negligence of Defendant, Gargi Schneider, M.D., the Estate of Stephen Childress has incurred substantial expenses for medical treatment.

**WHEREFORE**, Plaintiff, Danny R Childress Sr., as Administrator of the Estate of Stephen A Childress, Deceased, demands judgment be entered against Defendant Gari Schneider, M.D., in an amount in excess of Seventy-Five Thousand Dollars ($75,000), together with interest, costs and any other damages found to be proper.

### COUNT II – PROFESSIONAL NEGLIGENCE / VICARIOUS LIABILITY
### PLAINTIFF v. GEISINGER MEDICAL CENTER and GEISINGER CLINIC d/b/a GEISINGER MEDICAL GROUP and GEISINGER HEALTH SYSTEM FOUNDATION d/b/a GEISINGER HEALTH SYSTEM

103.     The preceding paragraphs of this Complaint are incorporated herein as if fully set forth at length.

104.     At all times material hereto, the physicians, physicians assistants, nurses and/or other treating health care workers were employees of Defendant, Geisinger Medical Center, and Geisinger Clinic d/b/a Geisinger Medical Group and Geisinger Health System Foundation d/b/a Geisinger Health System and were acting within the course and scope of their employment.

105.     Accordingly, Defendant, Geisinger Medical Center, is vicariously liable for the negligent acts and omissions identified herein.

106.     Defendants failed to provide proper healthcare under the circumstances and its acts and/or omissions fell below the applicable standard of care required of them.

107.     Defendants' negligence and carelessness consisted of the following:

a. Failure to appropriately evaluate and treat Stephen Childress for severe deep infection in the setting of persistent fever, toe pain, purple discoloration of the outer aspect of the left foot and elevated levels of C-reactive protein (CRP) and erythrocyte sedimentation rate (ESR) on December 31, 2019;

b. Failing to properly evaluate plaintiff's condition;

c. Failing to timely and/or properly recognize/diagnose Plaintiff's condition;

d. Failing to timely and/or properly provide further medical examination to determine the cause of Plaintiff's condition;

e. Failing to timely and/or properly provide further diagnostic evaluation, including necessary and proper testing, cultures and/or imaging, to diagnose infection;

f. Failure to appreciate and treat the medical condition of Stephen Childress;

g. Negligently discharging Stephen Childress with a severe deep infection;

h. Failing to properly and effectively coordinate patient care with home healthcare nurses;

i. Failing to properly communicate with home healthcare nurses to provide proper patient care;

j. Failing to request proper medical referrals and/or medical consults;

k. Failing to timely and/or properly order and/or obtain laboratory testing;

l. Negligently administering mediation/antibiotics.

m. Failing to properly evaluate Childress risk for venous thromboembolism;

n. Failing to prescribe and administer proper venous thromboembolism prophylaxis;

o. Failing to timely and/or properly ensure Plaintiff was taken to the operating room;

COMPLAINT - 21

p.  Failing to timely and/or properly ensure Plaintiff was ready to be taken to the operating room;

q.  Failing to timely and perform surgery;

r.  Failing to timely and/or properly appreciate the seriousness/severity of Plaintiff's condition;

s.  Failing to timely and/or properly respond to the seriousness/severity of Plaintiff's condition;

t.  Allowing Plaintiff's condition to continue to persist without proper intervention;

u.  Failing to ensure Plaintiff received timely and or proper examinations, monitoring, and/or wound checks / examinations;

v.  Failing to properly and/or timely obtain information from other physicians, residents, fellows, nurses and/or hospital staff;

w.  Failing to properly and/or timely transmit / communicate information to other physicians, residents, fellows, nurses, and/or hospital staff;

x.  Failing to properly and/or adequately supervise residents, fellows, nurses and other staff;

y.  Failing to timely and properly respond to examination findings;

z.  Failing to timely respond to the testing results;

aa. Failing to timely and/or properly provide medical, radiological and/or surgical diagnostic care and/or treatment.

108.   The carelessness and negligence of Defendants, Geisinger Medical Center, Geisinger Clinic d/b/a Geisinger Medical Group, and Geisinger Health System Foundation d/b/a Geisinger Health System, as set forth above, increased the risk of harm and/or was a

substantial factor and/or factual cause in causing the injuries and damages suffered by Plaintiffs, as set forth herein.

**WHEREFORE**, Plaintiff, Danny R Childress Sr., as Administrator of the Estate of Stephen A Childress, Deceased, demands judgment be entered against Defendants, in an amount in excess of Seventy-Five Thousand Dollars ($75,000), against Geisinger Medical Center, Geisinger Clinic d/b/a Geisinger Medical Group, and Geisinger Health System Foundation d/b/a Geisinger Health System, John and Jane Does 1 -10, and ABC Corps 1 – 10,  jointly and/or severally, together with interest, costs and any other damages found to be proper.

### COUNT III- DIRECT CORPORATE LIABILITY
### PLAINTIFF v. GEISINGER MEDICAL CENTER and GEISINGER CLINIC d/b/a GEISINGER MEDICAL GROUP and GEISINGER HEALTH SYSTEM FOUNDATION d/b/a GEISINGER HEALTH SYSTEM

109.     The preceding paragraphs of this Complaint are incorporated herein as if fully set forth at length.

110.     In addition to its vicarious liability, Defendant, Geisinger Medical Center, owed Stephen Childress a nondelegable duty, pursuant to the decision of the Supreme Court of Pennsylvania in Thompson v. Nason, 591 A.2d 709 (1991) and its progeny of case law, to (1) use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) select and retain only competent physicians; (3) oversee all persons who practice medicine within its walls; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients, including Stephen Childress.

111.     Defendant, Geisinger Medical Center, had actual and/or constructive knowledge of one or more of the following breaches:

a.   Failure to select and retain physicians and/or nursing personnel competent in the recognition, diagnosis, treatment, and management of Stephen Childress' medical condition;

b.   Failure to select and retain physicians and/or nursing personnel competent in judgment to appreciate the severity of Stephen Childress' medical condition;

c.   Failure to adopt and/or enforce appropriate rules, guidelines, procedures and/or protocols with respect to the proper and appropriate safeguards to ensure proper discharge planning;

d.   Failure to adopt and/or enforce appropriate rules, guidelines, procedures and/or protocols in order to ensure Stephen Childress' condition was treated in an adequate and timely manner;

e.   Failure to adopt and/or enforce appropriate rules, guidelines, procedures and/or protocols in order to ensure Stephen Childress' condition was under reasonable control before being discharged to home health care;

f.   Failure to adopt and/or enforce appropriate rules, guidelines, procedures and/or protocols to provide reasonable medical treatment to individuals without health insurance.

112.   Accordingly, Defendant, Geisinger Medical Center, is directly liable for the injuries and damages described herein.

**WHEREFORE**, Plaintiff, Danny R Childress Sr., as Administrator of the Estate of Stephen A Childress, Deceased, demands judgment be entered against Defendants, Geisinger Medical Center, Geisinger Clinic d/b/a Geisinger Medical Group, and Geisinger Health System Foundation d/b/a Geisinger Health System, and ABC Corps 1 – 10,   in an amount in excess of Seventy-Five

Thousand Dollars ($75,000), jointly and/or severally, together with interest, costs and any other damages found to be proper.

### COUNT V – PROFESSIONAL NEGLIGENCE / VICARIOUS LIABILITY PLAINTIFF v. UPMC HOME HEALTHCARE OF CENTRAL PENNSYLVANIA, a/k/a UPMC HOME HEALTHCARE OF CENTRAL PA – SUSQUEHANNA

113. The preceding paragraphs of this Complaint are incorporated herein as if fully set forth at length.

114. At the times material hereto, Defendant, UPMC Home Healthcare was responsible for providing home health care to Stephen Childress following his discharge to home from the hospital.

115. The negligence of the home health medical/nursing staff of HHC caused/contributed to the worsening condition of the wound and the untimely death of Stephen Childress.

116. Said negligence consisted of the following:

    a. Failure to properly and effectively serve as a liaison for Childress medical treatment and support the objectives outlined in the plan of care;

    b. Failure to timely refer patient for emergency treatment of his deteriorating and infected left foot ulcer;

    c. Failure to timely refer Childress for emergency medical treatment;

    d. Failure to timely refer Childress to an infectious disease doctor;

    e. Failure to implement an effective interchange, reporting and coordinated patient evaluation;

    f. Failure to reasonably follow Childress' discharge instructions;

g. Failure to appreciate the need for and/or provide proper medical treatment for Childress' infected left foot wound;

h. Failure to recognize and appreciate the serious time sensitive threat posed by the infection to Childress' left foot wound; and

i. Failure to properly and adequately communicate their patient's needs to his physicians.

117. At all times material hereto, the home health medical/nursing staff of UPMC Home Care acted (or failed to act) in the course and scope of their employment for UPMC Home Care.

118. Accordingly, Defendant, UPMC Home Care, is vicariously liable for the negligent acts and omissions of its staff identified herein.

**WHEREFORE**, Plaintiff, Danny R Childress Sr., as Administrator of the Estate of Stephen A Childress, Deceased, demands judgment be entered against Defendant, UPMC Home Healthcare, in an amount in excess of Seventy-Five Thousand Dollars ($75,000), together with interests, costs and any other damages found to be proper.

### COUNT VI – DIRECT CORPORATE NEGLIGENCE
### PLAINTIFF v. UPMC HOME HEALTHCARE OF CENTRAL PENNSYLVANIA, a/k/a UPMC HOME HEALTHCARE OF CENTRAL PA – SUSQUEHANNA

119. The preceding paragraphs of this Complaint are incorporated herein as if fully set forth at length.

120. In addition to its vicarious liability, UPMC Home Healthcare, owed Stephen Childress a nondelegable duty, pursuant to the decision of the Supreme Court of Pennsylvania in Thompson v. Nason, 591 A.2d 709 (1991) and its progeny of case law, to (1) use reasonable care in the maintenance of safe and adequate facilities and equipment;

(2) select and retain only competent physicians; (3) oversee all persons who practice medicine within its walls; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients, including Stephen Childress.

121.    Defendant, UPMC Home Healthcare, had actual and/or constructive knowledge of one or more of the following breaches:

g.   Failure to select and retain physicians and/or nursing personnel competent in the recognition, diagnosis, treatment, and management of Stephen Childress' medical condition;

h.   Failure to select and retain physicians and/or nursing personnel competent in judgment to appreciate the severity of Stephen Childress' medical condition;

i.   Failure to adopt and/or enforce appropriate rules, guidelines, procedures and/or protocols with respect to the proper and appropriate safeguards to ensure proper referral for emergency treatment;

j.   Failure to adopt and/or enforce appropriate rules, guidelines, procedures and/or protocols in order to ensure Stephen Childress' condition was treated in an adequate and timely manner;

122.    Accordingly, Defendant, UPMC Home Healthcare, is directly liable for the injuries and damages described herein.

**WHEREFORE**, Plaintiff, Danny R Childress Sr., as Administrator of the Estate of Stephen A Childress, Deceased, demands judgment be entered against Defendants, UPMC Home Healthcare and ABC Corps 1 – 10,   in an amount in excess of Seventy-Five Thousand Dollars ($75,000), together with interests, costs and any other damages found to be proper.

### COUNT VII – SURVIVAL ACTION
### <u>PLAINTIFF v. ALL DEFENDANTS</u>

123.    The preceding paragraphs of this Complaint are incorporated herein as if fully set forth at length.

124.    Plaintiff asserts survival action claims, as set forth in detail above, against all defendants for the injuries and damages described herein.

**WHEREFORE**, Plaintiff, Danny R Childress, Sr., Administrator of the Estate of Stephen A Childress, Deceased, demands judgment be entered against all Defendants, in an amount in excess of Seventy-Five Thousand Dollars ($75,000), jointly and/or severally, together with interest, costs and any other damages found to be proper.

### COUNT VIII – WRONGFUL DEATH
### PLAINTIFF v. GARGI SCHNEIDER, M.D., GEISINGER MEDICAL CENTER, GEISINGER CLINIC D/B/A GEISINGER MEDICAL GROUP, AND GEISINGER HEALTH SYSTEM FOUNDATION D/B/A GEISINGER HEALTH SYSTEM

125.    Plaintiff incorporates by reference hereto all of the preceding paragraphs of this Complaint as though fully set forth herein.

126.    Plaintiff brings this Count, a Wrongful Death Action, pursuant to 42 Pa.C.S. §8301.

127.    The aforementioned incident was caused by the negligent and careless conduct of Defendants, Gargi Schneider, M.D., Geisinger Medical Center, Geisinger Clinic d/b/a Geisinger Medical Group, and Geisinger Health System Foundation d/b/a Geisinger Health System.

128.    As a result of the death described herein, said family members of Stephen Childress have sustained emotional and psychological injuries, economic damages, and loss of support, assistance, affection, and consortium.

COMPLAINT - 28

129.     Accordingly, claim for damages is hereby made by said family members to the full extent permitted under the laws of the Commonwealth of Pennsylvania. *See* Rettger v. UPMC, 991 A.2d 915 (Pa. Super. 2010).

**WHEREFORE**, Plaintiff, Danny R Childress Sr., as Administrator of the Estate of Stephen A Childress, Deceased, demands judgment be entered against Defendants, Gargi Schneider, M.D., Geisinger Medical Center, Geisinger Clinic d/b/a Geisinger Medical Group, and Geisinger Health System Foundation d/b/a Geisinger Health System, John and Jane Does 1 -10, and ABC Corps 1 – 10,  in an amount in excess of Seventy-Five Thousand Dollars ($75,000), together with interests, costs and any other damages found to be proper.

### COUNT IX – WRONGFUL DEATH
### PLAINTIFF v. UPMC HOME HEALTHCARE

130.     Plaintiff incorporates by reference hereto all of the preceding paragraphs of this Complaint as though fully set forth herein.

131.     Plaintiff brings this Count, a Wrongful Death Action, pursuant to 42 Pa.C.S. §8301.

132.     The aforementioned incident was caused by the negligent and careless conduct of Defendant, UPMC Home Healthcare.

133.     As a result of the death described herein, said family members of Stephen Childress have sustained emotional and psychological injuries, economic damages, and loss of support, assistance, affection, and consortium.

134.     Accordingly, claim for damages is hereby made by said family members to the full extent permitted under the laws of the Commonwealth of Pennsylvania.  *See* Rettger v. UPMC, 991 A.2d 915 (Pa. Super. 2010).

**WHEREFORE**, Plaintiff, Danny R Childress Sr., as Administrator of the Estate of Stephen A Childress, Deceased, demands judgment be entered against Defendant, UPMC Home

Healthcare, John and Jane Does 1 -10 and ABC Corps 1 – 10,  in an amount in excess of Seventy-Five Thousand Dollars ($75,000), together with interests, costs and any other damages found to be proper.

**WIEAND LAW FIRM LLC**

By: _____

Brent Wieand, Esq.
Jeffrey Parker, Esq.
Attorneys for Plaintiff
Danny R. Childress, Sr., Admin. of the
Estate of Stephen A Childress

COMPLAINT - 30